[Cite as *State v. Ingersoll*, 2026-Ohio-1013.]

| STATE OF OHIO | ) | IN THE COURT OF APPEALS |
|---|---|---|
| | )ss: | NINTH JUDICIAL DISTRICT |
| COUNTY OF SUMMIT | ) | |

STATE OF OHIO

    Appellee

v.

GLADYS INGERSOLL

    Appellant

C.A. No.    31392

APPEAL FROM JUDGMENT
ENTERED IN THE
COURT OF COMMON PLEAS
COUNTY OF SUMMIT, OHIO
CASE No.    CR-2022-09-3299

DECISION AND JOURNAL ENTRY

Dated: March 25, 2026

STEVENSON, Judge.

{¶1} Defendant-Appellant, Gladys Ingersoll, appeals from the judgment of the Summit County Court of Common Pleas. This Court affirms.

I.

{¶2} Late one evening, C.S. and her best friend went to a bar in Akron. Ms. Ingersoll happened to be at the bar. The three females knew one another because they had attended the same high school. When Ms. Ingersoll approached C.S. and the best friend, the three women exchanged pleasantries for about fifteen to twenty minutes before Ms. Ingersoll walked away.

{¶3} C.S. and the best friend next encountered Ms. Ingersoll in the bar's small bathroom. C.S. and Ms. Ingersoll chatted while the best friend entered the stall. When the conversation turned to a boy they had both dated in high school, an argument ensued. C.S. and Ms. Ingersoll tussled until the best friend intervened. C.S. and the best friend then left the bathroom.

{¶4}    After C.S. and the best friend returned to their table, Ms. Ingersoll walked over and positioned herself in front of a juke box directly next to their table.  Ms. Ingersoll stared at C.S., and C.S. verbally expressed her frustration.  Although the best friend repeatedly told Ms. Ingersoll to leave, Ms. Ingersoll ignored her and remained where she was for approximately ten minutes.  She finally walked away with a male friend while C.S. and the best friend remained at the table.

{¶5}    C.S. and the best friend eventually returned to the bathroom and once again encountered Ms. Ingersoll.  According to the best friend, Ms. Ingersoll instigated another fight.  According to Ms. Ingersoll, C.S. attacked her for no reason.  The two ended up fighting in the bathroom's single stall and, during the encounter, Ms. Ingersoll shot C.S. in the pelvis.  C.S. was able to make it out of the bathroom before she collapsed.  Her friends rushed her to the hospital where doctors attempted surgery.  C.S. did not survive the procedure.

{¶6}    After Ms. Ingersoll emerged from the bathroom, she left the bar.  She walked around the back of the building and was still there when the police arrived.  Ms. Ingersoll ran from the police when they spotted her.  Officers commanded her to stop and to show her hands, but Ms. Ingersoll ignored the commands and pointed her gun at the police.  An officer then shot Ms. Ingersoll.  Once the police disarmed and arrested her, she was taken to a hospital for treatment.

{¶7}    Ms. Ingersoll was charged with aggravated murder, murder, felony murder, two counts of felonious assault, and obstructing official business.  Each of her counts also included an attendant firearm specification.  At the start of trial, the State dismissed the aggravated murder count, one of the felonious assault counts, and the firearm specifications linked to those counts.  The remaining counts and specifications were tried to a jury.  The jury found Ms. Ingersoll not guilty of murder and its attendant firearm specification.  The jury found her guilty of her remaining charges and specifications.  The trial court sentenced her to a total of 21 years to life in prison.

{¶8} Ms. Ingersoll now appeals from her convictions and raises one assignment of error for review.

II.

**ASSIGNMENT OF ERROR**

**GLADYS INGERSOLL'S MURDER CONVICTION IS AGAINST THE MANIFEST WEIGHT OF THE EVIDENCE.**

{¶9} In her sole assignment of error, Ms. Ingersoll argues her felony murder conviction is against the manifest weight of the evidence. Specifically, she argues the jury lost its way when it rejected her claim of self-defense. We disagree.

{¶10} When considering a challenge to the manifest weight of the evidence, this Court is required to consider the entire record, "weigh the evidence and all reasonable inferences, consider the credibility of witnesses and determine whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered." *State v. Otten*, 33 Ohio App.3d 339, 340 (9th Dist. 1986). "A reversal on this basis is reserved for the exceptional case in which the evidence weighs heavily against the conviction." *State v. Croghan*, 2019-Ohio-3970, ¶ 26 (9th Dist.). This Court "'will not overturn a conviction as being against the manifest weight of the evidence simply because the trier of fact chose to believe the State's version of events over another version.'" *State v. Tolliver*, 2017-Ohio-4214, ¶ 15 (9th Dist.), quoting *State v. Barger*, 2016-Ohio-443, ¶ 29 (9th Dist.).

{¶11} In Ohio, self-defense is an affirmative defense. *State v. Messenger*, 2022-Ohio-4562, ¶ 24. "[A] defendant charged with an offense involving the use of force has the burden of producing legally sufficient evidence that [his] use of force was in self-defense." *Id.* at ¶ 25. "Once a defendant satisfies his burden of production, the burden of persuasion shifts to the State 'to prove

beyond a reasonable doubt that the accused did not use force in self-defense.'" *State v. Massey*, 2024-Ohio-5542, ¶ 5 (9th Dist.), quoting *State v. Brooks*, 2022-Ohio-2478, ¶ 6. The State's burden "is subject to a manifest-weight review on appeal . . . ." *Messenger* at ¶ 27.

{¶12} The elements of self-defense are:

(1) that the defendant was not at fault in creating the situation giving rise to the affray; (2) that the defendant had a bona fide belief that he [or she] was in imminent danger of death or great bodily harm and that his [or her] only means of escape from such danger was in the use of such force; and (3) that the defendant did not violate any duty to retreat or avoid the danger.

(Bracketed text in original.) *Id.* at ¶ 14, quoting *State v. Barnes*, 94 Ohio St.3d 21, 24 (2002). "To carry its burden of persuasion, the State need only disprove one of the foregoing elements beyond a reasonable doubt." *State v. Fleckenstein*, 2023-Ohio-4347, ¶ 24 (9th Dist.).

{¶13} The best friend testified that she, C.S., and a male friend were enjoying food and drinks at a table when Ms. Ingersoll first approached them. Although the best friend was familiar with Ms. Ingersoll, she testified that they had never really spoken. She could not recall what they discussed at the table but described it as ordinary conversation. She estimated that Ms. Ingersoll spent 15 to 20 minutes with them before walking away. Surveillance footage from the bar evidenced Ms. Ingersoll's approach, the ensuing conversation, and her departure.

{¶14} The best friend testified that she and C.S. continued to drink and dance for a while before they went to the bathroom. When they entered, Ms. Ingersoll was already inside the bathroom, standing by the mirror. The best friend testified that she entered the single stall to use the toilet while C.S. and Ms. Ingersoll remained near the mirror and sink. She heard them engage in friendly conversation, which continued until she exited the stall. She testified that C.S. and Ms. Ingersoll then began arguing about a boy they had both dated in high school. According to the best friend, Ms. Ingersoll told C.S., "You can't beat me[,]" and threatened to "whip [her] ass" as

the situation continued to escalate. She testified that the two grabbed each other's hair and began to tussle before she intervened and forced them apart. She and C.S. then exited the bathroom while Ms. Ingersoll remained inside.

{¶15} The best friend testified that she and C.S. returned to their table and told their male friend what had happened. The three of them went outside where the best friend failed to convince C.S. they should leave the bar. She testified that the group ultimately returned to their table to have more drinks. Shortly thereafter, Ms. Ingersoll walked over to the juke box directly next to them.

{¶16} The best friend testified that C.S. and Ms. Ingersoll started arguing again, and she (the best friend) repeatedly told Ms. Ingersoll to walk away. She testified that Ms. Ingersoll ignored her, remained by the juke box, and stared at C.S. Video surveillance from the bar showed Ms. Ingersoll positioning herself in front of the juke box facing C.S. and remaining there for about ten minutes before walking away with a male friend and exiting the bar. The best friend testified that she never noticed Ms. Ingersoll come back inside.

{¶17} The best friend testified that C.S. later received a call from her sister, but the bar was too noisy to hear it. Hoping for a quieter area, the two hurried to the bathroom. The best friend testified that, when they entered, Ms. Ingersoll was already inside the bathroom. Ms. Ingersoll remained standing in front of the mirror while C.S. finished her phone call. She then turned around and "threaten[ed] [C.S.], like, what you want to go again." The best friend testified that another fight ensued and turned even more aggressive. C.S. and Ms. Ingersoll tussled through the open stall door to the toilet while the best friend remained outside it. The best friend testified that Ms. Ingersoll was on top of the toilet while C.S. was over her. According to the best friend, Ms. Ingersoll had C.S. by the hair and was pulling her down while the two exchanged punches.

The best friend testified that the toilet lid tank fell to the floor and shattered before she heard a loud pop. C.S. then emerged from the stall and said Ms. Ingersoll had shot her.

{¶18} The best friend testified that she saw Ms. Ingersoll holding a gun and looking confused. The best friend screamed for help and their male friend came to their aid. The best friend called 911, but the two rushed C.S. to the hospital in the male friend's car rather than waiting for an ambulance.

{¶19} The best friend testified that C.S. never had a gun or weapon on her that evening. Although C.S. repeatedly punched Ms. Ingersoll when their fight occurred, the best friend testified that Ms. Ingersoll instigated the incident. She testified that Ms. Ingersoll was the one who wanted to fight.

{¶20} A bar patron who was a close friend of C.S.'s family also happened to be at the bar the evening of the shooting. He testified that he did not know Ms. Ingersoll, but he noticed her when he arrived at the bar because she was smoking a cigarette outside in the middle of the street. Later that evening, he saw C.S. and the best friend walk to the bathroom together. A few minutes later, he heard a loud bang. The bar patron testified that C.S. made it out of the bathroom before collapsing. While he and a few others tended to her, he saw Ms. Ingersoll emerge from the bathroom holding a gun. Ms. Ingersoll continued to stand there while the bar patron and several others helped take C.S. outside.

{¶21} The bar patron testified that people scattered after the shooting, but he remained outside to wait for Ms. Ingersoll to emerge from the bar. When she did so, she turned right, walked to the side of the building, and headed toward the back of the building before disappearing. The bar patron testified that Ms. Ingersoll did not appear to be injured or to have any issues walking. When the police arrived, he pointed them in the direction she had gone.

{¶22} Officer David Luke responded to the shooting. He briefly spoke with a man outside the bar, learned Ms. Ingersoll was a potential suspect, and learned where she had gone. He and another officer set off on foot to try to locate Ms. Ingersoll. He testified that, when they located her, she ran. The two officers chased her to an open parking lot where she stopped next to a small semi-trailer. Officer Luke testified that he repeatedly commanded Ms. Ingersoll to show him her hands. Ms. Ingersoll then pointed a gun at him, and he fired four shots at her. Once she was subdued, the officers placed Ms. Ingersoll under arrest.

{¶23} Officer Vincent Reddish testified that he was the other officer who engaged in the foot chase alongside Officer Luke. He testified that, as he was chasing Ms. Ingersoll, he repeatedly yelled, "Akron Police Department" and words to the effect of "Let me see your hands, show me your hands[.]" Officer Reddish confirmed that Ms. Ingersoll pointed a gun at them before Officer Luke shot her.

{¶24} Dr. Lisa Kohler, the Summit County Medical Examiner, conducted C.S.'s autopsy. She testified that C.S. sustained a gunshot wound to the pelvis and died during surgery. Operative notes from her surgery showed that doctors found a bullet fragment inside her body. Dr. Kohler testified that, due to the lack of an exit wound or additional information, she was unable to offer any opinion as to the trajectory of the bullet other than to say that C.S. was shot from front to back. She was unable to determine the position of C.S. or Ms. Ingersoll at the time of the shooting. She also testified that the bullet was fired from an indeterminate range.

{¶25} Detective Michael Orrand investigated the shooting and reviewed surveillance footage from the bar. He offered a timeline of the events that transpired that evening, as captured by cameras inside and outside the bar. Regarding footage of Ms. Ingersoll leaving the bar

following the shooting, Detective Orrand testified that she did not appear to be injured. The detective also did not observe any tears, holes, stains, or blood on Ms. Ingersoll's clothing.

{¶26} Ms. Ingersoll testified in her own defense. Regarding her first encounter with C.S. in the bathroom, she testified that she and C.S. teased each other about a boy they had both dated in high school before C.S. "just attacked [her]." She claimed that C.S. hit her in the face several times, dragged her to the floor, and stomped on her. According to Ms. Ingersoll, the attack stopped, but she did not know why because she had her head down. She agreed that C.S. and the best friend left the bathroom together after the attack.

{¶27} Ms. Ingersoll admitted that, after the fight, she walked to the juke box next to C.S.'s table and stared at her. She testified that she did so because she felt C.S. owed her an apology. According to Ms. Ingersoll, she continued sitting there waiting for an apology while C.S. antagonized her and tried to make her feel bad.

{¶28} Ms. Ingersoll testified that she later returned to the bathroom and was coming out of the stall when C.S. and the best friend entered. She stated that she washed her hands and brushed her hair in the mirror while C.S. used the toilet and the best friend waited. Ms. Ingersoll then applied lip gloss, and the best friend asked to use it. Ms. Ingersoll testified that she gave her lip gloss to the best friend but refused to share it with C.S. when she emerged from the stall moments later and asked for it. Ms. Ingersoll testified that she told C.S. she could not borrow the lip gloss because C.S. had not apologized for attacking her. According to Ms. Ingersoll, C.S. then attacked her "out of nowhere[.]"

{¶29} Ms. Ingersoll testified that C.S. grabbed her and yanked her into the stall while the best friend blocked its entryway. It was her testimony that she was stuck inside the stall, facing the toilet, while C.S. hit her from behind. She claimed that she could not escape the stall because

the best friend would push her back inside. She testified that she then heard a "loud bang" and "got really scared because [she] didn't know what [C.S.] was about to do." Ms. Ingersoll testified that she grabbed a gun from her waistband and fired it backward and in between her legs toward C.S. She testified that she did so because she was trapped, scared, and felt she had no other option.

{¶30} Ms. Ingersoll claimed she sustained a graze wound to her right buttock when she fired her gun backwards toward C.S., who was bent over her on top of the toilet. She admitted that she did not appear to be limping in any of the surveillance footage that depicted her leaving the bar. It was her testimony that she did not initially feel the wound because she was in shock. She claimed that she was bleeding from the wound, however, and sustained scratches on her neck from C.S. According to Ms. Ingersoll, the police refused to photograph the scratches.

{¶31} When the State called C.S.'s aunt to testify, Ms. Ingersoll cross-examined her regarding several text messages C.S. sent her and two other family members after the first fight in the bathroom. In the first text, C.S. wrote: "I just fought" followed by a crying with laughter emoji. She then identified Ms. Ingersoll as the individual with whom she had fought. When asked if she had won the fight, C.S. messaged: "Yes girl she didn't get to touch me[.]"

{¶32} Ms. Ingersoll called an expert witness as part of her defense. Jeffrey Dovci testified as an independent forensic consultant. As part of his investigation, he reviewed medical records from Ms. Ingersoll's trip to the hospital after Officer Luke shot her. Mr. Dovci testified that the medical records showed Ms. Ingersoll sustained a gunshot wound to the groin area and a graze wound to the right buttock. He opined that the wound she sustained to her right buttock was consistent with her having shot a gun backwards and between her legs during the final confrontation between her and C.S. According to Mr. Dovci, that was "really kind of [the] only practical way that the gun could [have been] held." He based his opinion on the trajectory of the

graze wound and the fact that doctors only recovered a bullet fragment when they operated on C.S. According to Mr. Dovci, the bullet must have struck something before entering C.S. because C.S.'s wound was "not consistent with an unimpeded bullet that was fired from the toilet area forward towards the sink." He testified that "logically," the only explanation he had was that the bullet must have struck a purse C.S. was wearing at the time of the fight and fragmented before a piece of the bullet entered her body. He admitted that he never saw the purse because law enforcement never processed it. Nevertheless, he noted that no other bullet fragments were found in the bathroom or C.S.'s body. Mr. Dovci rejected the possibility that Ms. Ingersoll's graze wound was caused by the police officer who shot at her four times. He testified that police officers are trained to shoot directly at a person's center mass, so any bullet would be traveling parallel to the ground. He indicated that Ms. Ingersoll's graze wound was "at a very bizarre angle[.]" Thus, he concluded that its trajectory was such that it was "not going to be from a police officer shooting directly at an individual." Mr. Dovci admitted that he did not review the body cam footage from the shooting and did not know where Officer Luke was positioned when he shot Ms. Ingersoll.

{¶33} Ms. Ingersoll argues that the jury lost its way when it rejected her claim of self-defense and found her guilty of felony murder. While there was "some conflicting testimony[,]" Ms. Ingersoll insists that the bulk of the evidence corroborated her version of the events. It showed that C.S. was on top of her and attacking her from behind, there was a "loud bang" during the attack, and she fired her gun in between her legs while in a curled-up position. Ms. Ingersoll notes that even the best friend admitted she (Ms. Ingersoll) appeared confused directly after the shooting; a reaction consistent with her dismay over having to fire her gun. Further, she notes that she presented unrebutted expert testimony showing she fired her gun in the manner she described. Ms. Ingersoll asserts that the best friend's version of the events was biased given her close relationship

with C.S. Additionally, she argues that C.S.'s text messages following their first encounter in the bathroom showed C.S. was unconcerned about the fight and supported the conclusion that C.S. was the initial aggressor. According to Ms. Ingersoll, the State failed to disprove her claim of self-defense.

{¶34} Having reviewed the record, we cannot conclude that the jury went so far as to lose its way when it found that the State met its burden of persuasion and proved that Mr. Ingersoll did not act in self-defense. *See Messenger*, 2022-Ohio-4562, at ¶ 27. As previously noted, the State only needed to disprove one element of Ms. Ingersoll's self-defense claim to overcome it. *See Fleckenstein*, 2023-Ohio-4347, at ¶ 24 (9th Dist.). While Ms. Ingersoll claimed C.S. was the initial aggressor, the jury heard the best friend testify that Ms. Ingersoll was the one who attacked C.S. on two separate occasions. The jury also saw footage of Ms. Ingersoll positioning herself directly next to C.S.'s table in between the first and second fights, staring at her for almost ten minutes, and ignoring the best friend's pleas for her to walk away. Though Ms. Ingersoll claimed she had to fire her gun in between her legs because C.S. had attacked her from behind, the jury heard the best friend testify that Ms. Ingersoll had C.S. by the hair and was pulling her down. The jury also saw footage of Ms. Ingersoll leaving the bar without any apparent limp or injury despite her claim that she shot herself when she fired her gun from an awkward position. "This Court will not overturn a verdict on a manifest weight challenge simply because the jury chose to believe the State's version of the events." *State v. Harris*, 2024-Ohio-196, ¶ 19 (9th Dist.). The jury was in the best position to assess the credibility of the testifying witnesses and could have determined that Ms. Ingersoll's account was not credible. *See State v. Rose*, 2026-Ohio-340, ¶ 10 (9th Dist.). Upon review, the jury reasonably could have concluded that the State disproved Ms. Ingersoll's claim that she was not at fault in creating the situation giving rise to the affray. *See Messenger* at ¶ 27.

This is not an exceptional case in which the evidence weighs heavily against Ms. Ingersoll's conviction. *See Croghan*, 2019-Ohio-3970, at ¶ 26 (9th Dist.). As such, her sole assignment of error is overruled.

## III.

{¶35} Ms. Ingersoll's sole assignment of error is overruled. The judgment of the Summit County Court of Common Pleas is affirmed.

Judgment affirmed.

———

There were reasonable grounds for this appeal.

We order that a special mandate issue out of this Court, directing the Court of Common Pleas, County of Summit, State of Ohio, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.

Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(C). The Clerk of the Court of Appeals is instructed to mail a notice of entry of this judgment to the parties and to make a notation of the mailing in the docket, pursuant to App.R. 30.

Costs taxed to Appellant.

SCOT STEVENSON
FOR THE COURT

HENSAL, P. J.
SUTTON, J.
<u>CONCUR.</u>


<u>APPEARANCES:</u>

MAX HERSCH, Assistant Public Defender, for Appellant.

ELLIOT KOLKOVICH, Prosecuting Attorney, and C. RICHLEY RALEY, JR., Assistant Prosecuting Attorney, for Appellee.